957 So.2d 1061 (2006)
CITY OF BESSEMER et al.
v.
E.B. McCLAIN et al.
1031917.
Supreme Court of Alabama.
July 28, 2006.
Opinion Overruling Rehearing November 3, 2006.
*1064 J. Bentley Owens III of Starnes & Atchison, LLP, Birmingham; Philip F. Hutcheson and April B. Danielson of Boardman, Carr, Weed & Hutchison, P.C., Birmingham; and Jon B. Terry of Bains & Terry, Bessemer, for appellants.
J. Bentley Owens III of Starnes & Atchison, LLP, Birmingham; Mark S. Boardman, Philip F. Hutcheson, and April B. Danielson of Boardman, Carr, Weed & Hutchison, P.C., Birmingham; and Jon B. Terry of Bains & Terry, Bessemer, for appellants, on second application for rehearing.
William A. Short, Jr., and T. Kenneth Forster, Bessemer; Calvin M. Whitesell, Montgomery; and Ralph D. Cook and John W. Haley of Hare, Wynn, Newell & Newton, Birmingham, for appellees.

On Application for Rehearing
PER CURIAM.
The opinion of January 13, 2006, is withdrawn, and the following is substituted therefor.
The cities of Bessemer, Homewood, Hoover, Hueytown, Mountain Brook, Trussville, and Vestavia Hills (collectively referred to as "the Cities"), all located in Jefferson County, appeal from the judgment of the Bessemer Division of the Jefferson Circuit Court declaring various taxing ordinances adopted by the Cities invalid and imposing a constructive trust on the taxes collected by the Cities pursuant to those ordinances. As to the claims asserted against Bessemer, Hoover, and Hueytown, we affirm the trial court's judgment. As to the claims asserted against Homewood, Mountain Brook, Trussville, and Vestavia Hills, we vacate the trial court's judgment and remand this case to the trial court with directions to dismiss those claims or to transfer them to the Birmingham Division of the Jefferson Circuit Court.

*1065 I. Background

On September 23, 2003, E.B. McClain and the Alabama Wholesale Distributors Association ("AWDA") filed a complaint in the Bessemer Division of the Jefferson Circuit Court. On March 1, 2004, McClain and AWDA amended their complaint to add as plaintiffs W.L. Petrey Wholesale Company, City Wholesale Grocery Company, Tobacco Post LLC, and Charles Lee Rackley, Jr. (The plaintiffs are hereinafter referred to collectively as "McClain.") The complaint sought a judgment declaring the following municipal ordinances invalid:
1. City of Bessemer Ordinance No. 3227, effective January 1, 2004, imposing a $.10 tax per pack of cigarettes and $.10 tax per package of smoking tobacco to be collected and paid by wholesalers of tobacco products delivering to retailers within the city limits of Bessemer and also imposing taxes on cigars, chewing tobacco, and snuff products;
2. City of Birmingham Ordinance No. 03-134, effective September 1, 2003, imposing a $.10 tax per pack of cigarettes and $.10 tax per package of smoking tobacco to be collected and paid by wholesalers of tobacco products delivering to retailers within the city limits of Birmingham and also imposing taxes on cigars, chewing tobacco, and snuff products;[1]
3. City of Fairfield Ordinance No. 964, effective October 1, 2003, imposing a $.10 tax per pack of cigarettes and $.10 tax per package of smoking tobacco to be collected and paid by wholesalers of tobacco products delivering to retailers within the city limits of Fairfield and also imposing taxes on cigars, chewing tobacco, and snuff products;[2]
4. City of Homewood Ordinance No. 2182, effective January 1, 2004, imposing a $.10 tax per pack of cigarettes and $.10 tax per package of smoking tobacco to be collected and paid by wholesalers of tobacco products delivering to retailers within the city limits of Homewood and also imposing taxes on cigars, chewing tobacco, and snuff products;
5. City of Hoover Ordinance No. 03-1978, effective January 1, 2004, imposing a $.10 tax per pack of cigarettes and $.10 tax per package of smoking tobacco to be collected and paid by wholesalers of tobacco products delivering to retailers within the city limits of Hoover and also imposing taxes on cigars, chewing tobacco, and snuff products;
6. City of Hueytown Ordinance No. 03-0812-02, effective September 1, 2003, imposing a $.10 tax per pack of cigarettes and $.10 tax per package of smoking tobacco to be collected and paid by wholesalers of tobacco products delivering to retailers within the city limits of Hueytown and also imposing taxes on cigars, chewing tobacco, and snuff products;
7. City of Mountain Brook Ordinance No. 1586, effective September 8, 2003, imposing a $.10 tax per pack of cigarettes *1066 and $.10 tax per package of smoking tobacco to be collected and paid by wholesalers of tobacco products delivering to retailers within the city limits of Mountain Brook and also imposing taxes on cigars, chewing tobacco, and snuff products;
8. City of Trussville Ordinance No. 2003-034-ADM, effective October 1, 2003, imposing a $.10 tax per pack of cigarettes and $.10 tax per package of smoking tobacco to be collected and paid by wholesalers of tobacco products delivering to retailers within the city limits of Trussville and also imposing taxes on cigars, chewing tobacco, and snuff products; and
9. City of Vestavia Hills Ordinance No. 1659-C, effective October 1, 2003, imposing a $.08 tax per pack of cigarettes and $.08 tax per package of smoking tobacco to be collected and paid by wholesalers of tobacco products delivering to retailers within the city limits of Vestavia Hills and also imposing taxes on cigars, chewing tobacco, and snuff products, as well as a license tax of $150 plus 3/4 of 1% of the annual gross sales from all tobacco products to be paid by anyone distributing tobacco products within the city limits of Vestavia Hills.
McClain argued that the above-referenced municipal ordinances were invalid because, he argued, they improperly taxed tobacco products in violation of Act No. 414, Ala. Acts 1947. The title and pertinent sections of Act No. 414 provide:
"AN ACT
"To apply in, but only in, counties which have a population of 400,000 inhabitants, or more, according to the last or any subsequent Federal Census; to fix, levy and to require the payment to such counties of a license tax, in addition to all other taxes or licenses now required by law, of two cents ($0.02) for each package of cigarettes, containing not more than 20 cigarettes and ($0.02) for each additional 20 cigarettes or fractional part thereof in such package sold, stored, or received, for the purpose of distribution to any person, firm, corporation, club, or association within such counties, and to fix and levy a tax on smoking tobacco upon each package containing not more than 1 1/8 ounces .005 (1/2 cent) each package over 1 1/8 ounces and not exceeding 2 ounces $0.015 (1 1/2 cents) over 2 ounces and not exceeding 3 ounces $0.025 (2 1/2 cents) over 3 ounces and not exceeding 4 ounces $.035 (3 1/2 cents) and $0.01 (1 cent) additional for each ounce or fractional part thereof over 4 ounces; to provide for the payment of said tax by the purchase and sale of stamps to be affixed to each said package of cigarettes or smoking tobacco sold or distributed, in such counties; to provide for the ascertainment, collection, payment and distribution of such license tax and for the enforcement of this act; to prescribe penalties and fix the punishment for the violation of any provisions of this act; and to repeal any existing ordinances or statutes in conflict with the provisions of this act; to prohibit future license or excise taxes by municipalities; and to provide the effective date of this act.
"Be It Enacted by the Legislature of Alabama:
"SECTION 1. This act shall apply in, but only in, counties which have a population of 400,000 inhabitants, or more, according to the last or any subsequent Federal Census; this act shall not have the effect of altering or repealing in any wise any statute now in effect, but shall be in addition to and cumulative of all laws now in effect.
". . . .

*1067 "SECTION 3. In addition to all other taxes now imposed by law, every person who sells, stores, or delivers any cigarettes or smoking tobacco in any county subject to the provisions of this act, shall pay a license tax to the county, subject to the provisions of this act, and a license tax is hereby fixed, created and levied in the amount of two cents ($0.02) on each package of cigarettes containing not more than 20 cigarettes and ($0.02) for each additional 20 cigarettes or fractional part thereof in such package sold, stored, or received for the purpose of distribution or sale to any person, firm, corporation, club, or association within such county; and a license tax is hereby fixed, created and levied on smoking tobacco sold, stored or received for the purpose of distribution or sale to any person, firm, corporation, club or association within such county, upon each package containing not more than 1 1/8 ounces .005 (1/2 cent), each package over 1 1/8 ounces and not exceeding 2 ounces $.015 (1 1/2 cents), over 2 ounces and not exceeding 3 ounces $.025 (2 1/2 cents), over 3 ounces and not exceeding 4 ounces $.035 (3 1/2 cents) and $0.01 (1 cent) additional for each ounce or fractional part thereof over 4 ounces; provided, however, that when the additional license tax hereby required to be paid shall have been paid by a wholesaler or seller of cigarettes or smoking tobacco, such payment shall be sufficient, the intent being that such license tax hereby required to be paid shall be paid but once on each package of cigarettes or smoking tobacco. The tax levied by this act shall be paid through the use of stamps as herein provided.
". . . .
"SECTION 9. The license tax required to be paid by this act through the purchase of tobacco stamps from the Probate Judge shall be received by him and shall be distributed by him. . . .
". . . .
"SECTION 13. Upon this act becoming effective or operative in any county, every then existing ordinance of every municipality within such county which levies or imposes a license tax on tobacco products payable by purchase and affixation of stamps shall be, ipso facto, repealed to the extent that it levies or imposes a license tax on tobacco products payable by purchase and affixation of stamps, and no municipality within such county shall have power or authority to re-enact or pass any ordinance which levies or imposes [a] license tax on tobacco products payable by purchase and affixation of stamps so long as this act is operative in such county."
(Emphasis added.)
McClain asserted that the Cities adopted the ordinances in response to a provision in Governor Bob Riley's 2003 tax-and-accountability package that was to be voted on in a statewide referendum on September 9, 2003.[3] If the provision had passed in the referendum, it would have prohibited local governments from taxing tobacco products in the future. Although Governor Riley's tax referendum subsequently *1068 failed, the ordinances adopted by the Cities in anticipation of the passage of the tax package remained in effect.[4]
The Cities filed a motion to dismiss the complaint. They argued that the complaint failed to state a claim upon which relief could be granted because the plaintiffs lacked standing to pursue their claims. The Cities also argued that the language of Act No. 414, Ala. Acts 1947, did not prohibit the municipal ordinances adopted by the Cities because, they argued, those ordinances did not impose tobacco taxes and did not direct that the taxes be collected through affixing stamps to tobacco products.
Homewood, Mountain Brook, Trussville, and Vestavia Hills also argued that venue in the Bessemer Division of the Jefferson Circuit Court was improper as to them. Those cities sought a dismissal or a transfer of the action as to them to the Birmingham Division of the Jefferson Circuit Court. The trial court denied their motion, finding venue in the Bessemer Division proper as to all the Cities.
McClain then requested that the trial court order the Cities to escrow all funds collected under their respective tobacco-tax ordinances pending a final hearing in this matter. The trial court granted this request.
On March 16, 2004, Cooper Green Hospital, a not-for-profit hospital operated by Jefferson County, sought permission to intervene in the action. Cooper Green Hospital asserted that it was responsible for providing indigent health care in Jefferson County for tobacco-related diseases and that the majority, if not all, of the allegedly illegal taxes collected by the Cities had been paid by smokers in Jefferson County. Cooper Green Hospital argued that those taxpayers who had actually paid the tax could not be identified and that, therefore, the funds could not be returned to those taxpayers. Cooper Green Hospital suggested that the best use of any illegally collected funds would be to subsidize the treatment at Cooper Green Hospital of Jefferson County residents who suffered from tobacco-related diseases. The trial court granted Cooper Green Hospital's motion to intervene. McClain suggested that the Bessemer Board of Education would also be a proper recipient for the purportedly illegally collected funds.
The trial court conducted a hearing on the issues raised in the declaratory-judgment complaint. In July 2004, the trial court entered an order (1) finding that E.B. McClain and the other plaintiffs were proper parties and had standing to bring the declaratory-judgment action; (2) declaring that the municipal taxing ordinances violated Act No. 414, Ala. Acts 1947; (3) ordering that the funds collected pursuant to the municipal ordinances be held in an interest-bearing account until such time as this case becomes final; (4) ordering that a trust be established under the doctrine of cy pres from the funds collected pursuant to the municipal ordinances to be distributed in a manner to be determined; and (5) awarding an attorney fee to counsel for the plaintiffs. The trial court relied upon language in the body of Act No. 414 and language in the title to that Act to conclude that Act No. 414 prohibited the Cities from enacting and collecting taxes on tobacco products in addition to those levied by Act No. 414, regardless of whether those additional taxes were payable through the purchase and affixation of stamps.
*1069 On August 5, 2004, the trial court conducted a hearing to determine to whom the funds improperly collected under the municipal ordinances should be disbursed and to determine the amount of the attorney fee. The trial court awarded an attorney fee to McClain's attorneys of 33 1/3% of the common fund created by the illegally collected taxes. The trial court concluded that, after payment of the attorney fee, the balance of the common fund should be distributed to Cooper Green Hospital and to the Bessemer Board of Education.[5]
The Cities filed a motion to alter, amend, or vacate the judgment, which the trial court denied. The Cities appeal, making the following arguments:
A. The trial court lacked subject-matter jurisdiction and its lack of subject-matter jurisdiction mandates dismissal.
B. The Bessemer Division is an improper venue for the Cities of Vestavia Hills, Trussville, Homewood and Mountain Brook.
C. The unambiguous construction of Act No. 414 permits local taxation without a tobacco stamp.
D. Attorney fees under the common-benefit theory are not applicable to this proceeding.
E. The doctrine of cy pres is inapplicable here because of the absence of difficulty in ascertaining a class of beneficiaries.

II. Analysis

A. Subject-Matter Jurisdiction

The Cities first argue that, under the Alabama Taxpayers' Bill of Rights and Uniform Revenue Procedures Act, § 40-2A-1 et seq., Ala.Code 1975, McClain was required to exhaust his administrative remedies before filing his complaint for a declaratory judgment. Because McClain did not do so, the Cities argue, the trial court did not have subject-matter jurisdiction of this action. We disagree.
As McClain correctly argues, a party who raises questions of law that predominate over questions of fact in a particular action need not pursue administrative remedies. A party challenging the construction given a statute is raising a question of law. An administrative agency would be without authority to make a determinative ruling on such a statutory challenge. When the administrative body is without power to redress the complained-of harm, the complaining party is not required to engage in what would be a futile process. See Mingledorff v. Vaughan Reg'l Med. Ctr., Inc., 682 So.2d 415 (Ala.1996) (addressing a challenge to the validity and legality of a tax statute); and Budget Inn of Daphne, Inc. v. City of Daphne, 789 So.2d 154 (Ala.2000) (addressing a challenge to a zoning ordinance).
These principles apply equally in this case. McClain, the complaining party, was not required to participate in administrative proceedings when the administrative body in charge of those proceedings would have had no authority to make a determinative ruling on McClain's complaint. In short, McClain had no administrative remedies to exhaust before filing the complaint for a declaratory judgment.

B. Venue in the Bessemer Division

McClain filed this complaint in the Bessemer Division of the Jefferson Circuit Court.[6] However, Homewood, Mountain *1070 Brook, Trussville, and Vestavia Hills are located entirely within the geographical boundaries of the Birmingham Division of the Jefferson Circuit Court. Homewood, Mountain Brook, Trussville, and Vestavia Hills filed a motion to dismiss the complaint or, alternatively, to sever and transfer the action as to them to the Birmingham Division of the Jefferson Circuit Court based on improper venue. They argued that the claims asserted against them could be brought only in the Birmingham Division. The trial court denied the motion. Homewood, Mountain Brook, Trussville, and Vestavia Hills appeal that ruling.
We begin by reviewing the history of the Bessemer Division. In 1893, Local Act No. 281 created the Bessemer Division; however, that division was subsequently abolished. In 1919, the Bessemer Division was recreated by Local Act No. 213 ("the Bessemer Act"). Section 2 of the Bessemer Act provides:
"The said Circuit Court of the Tenth Judicial Circuit, holding at Bessemer, as in this Act provided, shall have, exercise and possess all of the jurisdiction and the powers which are now or which may hereafter be conferred by law on the several Circuit Courts of this State, which said jurisdiction and powers shall be exclusive in, limited to, and extend over that portion of the territory of the County of Jefferson, which is included in the following precincts, to wit: [a physical description of what is commonly referred to as the Bessemer Cut-Off]. . . . "
In Glenn v. Wilson, 455 So.2d 2 (Ala. 1984), this Court addressed whether the Bessemer Act is jurisdictional or addresses solely venue:
"We acknowledge that some of the cases are less than clear and seem to confuse venue and jurisdiction by use of the term `territorial jurisdiction.' However, we are convinced thatexcept for those cases which by their nature can be adjudicated only in a particular county, such as suits for partition of land or suits to enforce a lien on land, both of which must be brought in the county where the land liessuits `arising in' the geographical boundaries of the Bessemer Cutoff but filed in Birmingham (or, vice versa, suits `arising in' the Birmingham Division but filed in Bessemer) are subject to transfer to the proper division pursuant to the provisions of § 12-11-11, Code 1975. . . .
"`. . . . '
"The Bessemer Cutoff legislation does not diminish the general jurisdiction of other circuit courts, either in Jefferson or other counties. Therefore, in those Jefferson County cases subject to transfer to the other division pursuant to § 12-11-11, a claim for transfer based on the improper filing may be waived, just as in a suit filed in some other county the parties may waive claims of improper venue."
455 So.2d at 4-5 (citations omitted).
Subsequent decisions also have concluded that the Bessemer Act controls venue between the two divisions. In Ex parte Walter Industries, Inc., 879 So.2d 547, 552 (Ala.2003), this Court stated:
"While at times this limitation [that the Jefferson Circuit Court, sitting in the Bessemer Division, could hear only cases `arising in' that division] has been described as jurisdictional, this Court has recognized since Glenn v. Wilson, [455 So.2d 2 (Ala.1984)], that the limitation in the [Bessemer] Act is one of venue. In sum, the voluminous caselaw on this issue clearly holds that venue for an action filed in Jefferson County is proper in the Bessemer Division only if the cause of action `arose' in that division."
*1071 See also Ex parte World Omni Fin. Corp., 491 So.2d 236, 237 (Ala.1986) ("Venue in this case is controlled by the local act creating the Bessemer Division."); Ex parte Jackson, 516 So.2d 768, 769 (Ala. 1986) (agreeing that the Bessemer Act "should be read as venue legislation rather than jurisdiction legislation"); and Ex parte Johnson, 692 So.2d 843, 845 (Ala.Civ. App.1997) ("It is well established that the Bessemer Division is, in fact, a separate and distinct circuit with the same power exercised by the Tenth Judicial Circuit . . . and that the legislation creating the two divisions in Jefferson County is `venue' legislation rather than `jurisdiction' legislation.").
When the rationale of those cases is applied to the facts of this case, it is evident that the claims asserted against Homewood, Mountain Brook, Trussville, and Vestavia Hills were improperly filed in the Bessemer Division because those claims did not arise in the Bessemer Division. Those municipalities enacted their ordinances in the Birmingham Division; those ordinances applied only in the Birmingham Division; and those municipalities enforced their ordinances in the Birmingham Division and collected the allegedly invalid tax there. Because none of these events occurred within the geographical boundaries of the Bessemer Division, venue in the Bessemer Division was improper as to the claims asserted against Homewood, Mountain Brook, Trussville, and Vestavia Hills.
Accordingly, the trial court improperly denied the motion filed by Homewood, Mountain Brook, Trussville, and Vestavia Hills to dismiss the action against them or to transfer it to the Birmingham Division. Venue as to those municipalities was improper in the Bessemer Division, and the trial court should have granted their motion to dismiss or to transfer the claims against them to the Birmingham Division.
McClain also argues that it would be wasteful and futile to require two different courts to hear the same claims, the same evidence, and the same defenses. However, we must construe the Bessemer Act consistent with the unambiguous language in that Act. The trial court erred in denying the motion to dismiss or, alternatively, to sever and transfer the claims against Homewood, Mountain Brook, Trussville, and Vestavia Hills to the Birmingham Division.
Because venue as to Homewood, Mountain Brook, Trussville, and Vestavia Hills was improper in the Bessemer Division, we vacate the trial court's judgment as to those municipalities. We remand the case to the trial court with directions to dismiss the claims asserted against Homewood, Mountain Brook, Trussville, and Vestavia Hills, or to transfer the claims against those municipalities to the Birmingham Division. Should the trial court dismiss the claims, then the escrow of all funds collected under their respective tobacco-tax ordinances by Homewood, Mountain Brook, Trussville, and Vestavia Hills shall be terminated, and the funds returned to the respective municipalities by the clerk of the Jefferson Circuit Court. Should the trial court transfer the claims against Homewood, Mountain Brook, Trussville, and Vestavia Hills to the Birmingham Division, the funds collected under the previously ordered escrow by those municipalities shall remain with the circuit clerk subject to the further order of the Birmingham Division.

C. Whether Act No. 414 Permits Local Taxation Without a Tobacco Stamp

1. Overview

We address the merits of the issue whether the ordinances adopted by Bessemer, Hoover, and Hueytown ("the Bessemer Division Cities") violated Act No. *1072 414, Ala. Acts 1947. The trial court declared the ordinances adopted by the Bessemer Division Cities invalid under Act No. 414, Ala. Acts 1947. In reaching its decision, the trial court answered affirmatively each of the following questions:
1. Is Act No. 414 clear in its purpose and applicability?
2. Does Act No. 414 prevent other taxation of tobacco products?
3. Do the ordinances adopted by the Bessemer Division Cities conflict with Act No. 414?
4. Do the ordinances adopted by the Bessemer Division Cities constitute improper license or privilege taxes under § 11-51-90, Ala.Code 1975?
The Bessemer Division Cities appeal the trial court's ruling regarding the validity of their ordinances. They argue that § 11-51-90, Ala.Code 1975, empowers municipalities to impose license fees and that Act No. 414 does not prohibit municipalities within Jefferson County from taxing tobacco products so long as the municipal tax or license fee is not imposed or enforced through the use of a stamp affixed to the tobacco products. The Bessemer Division Cities also argue that the trial court erroneously relied upon nonspecific language found in the title to Act No. 414, when the specific language in the Act itself was unambiguous.

2. Taxing Powers of Municipalities

"Municipalities have no inherent power of taxation. The state, however, having the power to tax, may delegate this power to a municipality. The authority of municipalities in Alabama to place a license tax on businesses and professions is found in Code 1975, § 11-51-90." Alabama Farm Bureau Mut. Cas. Ins. Co. v. City of Hartselle, 460 So.2d 1219, 1222 (Ala.1984) (citation omitted). Section 11-51-90, Ala.Code 1975, states, in pertinent part:
"(a) All municipalities shall have the following powers:
"(1) To license any exhibition, trade, business, vocation, occupation, or profession not prohibited by the Constitution or laws of the state which may be engaged in or carried on in the city or town.
"(2) To fix the amount of licenses, the time for which they are to run, not exceeding one year, to provide a penalty for doing business without a license, and to charge a fee of not exceeding five dollars ($5) for issuing each license.
"(3) To require sworn statements as to the amount of capital invested, value of goods or stocks, or amounts of sales or receipts where the amount of the license is made to depend upon the amount of capital invested, value of goods or stocks, or amount of sales or receipts and to punish any person or corporation for failure or refusal to furnish sworn statements or for giving of false statements in relation thereto.
"(b) The license authorized by subsection (a) of this section as to persons, firms, or corporations engaged in business in connection with interstate commerce shall be confined to that portion within the limits of the state and where the person, firm, or corporation has an office or transacts business in the city or town imposing the license.
"(c) The power to license conferred by this division may be used in the exercise of the police powers as well as for the purpose of raising revenue, or both."
This Court has generally interpreted § 11-51-90 as an express grant of power to municipalities to adopt ordinances fixing the amount of a license to conduct a trade or business in the municipalities. See Ridgeway v. City of Bessemer, 9 Ala.App. *1073 470, 64 So. 189 (1914) (construing earlier codification of statute). Additionally, if the power delegated to a municipality by the State is not expressly limited, that delegation of power is construed as including all of the taxing powers possessed by the State. Town of Hackleburg v. Northwest Alabama Gas Dist., 277 Ala. 355, 170 So.2d 792 (1964).

3. Analysis of Act No. 414

We now turn to Act No. 414 to ascertain whether the municipal ordinances imposing an additional tax on tobacco products improperly tax tobacco products in violation of Act No. 414, Ala. Acts 1947. The legislature enacted Act No. 414, a general act of local application, in 1947. The Act applied to Jefferson County, among other counties. The obvious purpose of the Act is to impose in counties having a population of 400,000 inhabitants or more a single tax on tobacco products. The municipalities located within the affected counties receive a portion of the tax levied under Act No. 414.
Although stamps were the usual method of collecting license taxes when Act No. 414 was enacted,[7] technology has advanced to a degree that taxes on tobacco products can be effectively collected without the use of stamps. The current ability to collect taxes without the use of stamps has allowed the municipalities to create this new scheme of taxation.
Section 3 of Act No. 414 sets out the taxable obligation and provides that
"every person who sells, stores, or delivers any cigarettes or smoking tobacco in any county subject to the provisions of this act, shall pay a license tax to the county, subject to the provisions of this act. . . . The tax levied by this act shall be paid through the use of stamps as herein provided."
Section 2, the definitional section of Act No. 414, defines the term "stamps" to mean "the stamp or stamps by use of which the tax is [sic] levied under this statute is paid." By the terms of Act No. 414, the tobacco tax is ultimately levied on the consumer, but it is the licensee who is obligated to act as the collection agent for the State under § 3 1/2.
Section 5 of Act No. 414 provides:
"Before any cigarettes or smoking tobacco shall be sold or delivered within the limits of any county subject to the provisions of the act by any wholesaler or dealer, such wholesaler or dealer shall affix to each package of cigarettes and smoking tobacco a stamp or stamps obtained from the Probate Judge of the county. . . . "
Section 7 makes it unlawful for any person required by the Act to affix stamps to cigarettes or smoking tobacco to fail to do so. Section 13 prohibits a municipality within any county to which the Act applies from passing any ordinance "which levies or imposes [a] license tax on tobacco products payable by purchase and affixation of stamps so long as this act is operative in such county." Section 13 in its entirety provides:
"Upon this act becoming effective or operative in any county, every then existing ordinance of every municipality within such county which levies or imposes a license tax on tobacco products payable by purchase and affixation of *1074 stamps shall be, ipso facto, repealed to the extent that it levies or imposes a license tax on tobacco products payable by purchase and affixation of stamps, and no municipality within such county shall have power or authority to re-enact or pass any ordinance which levies or imposes [a] license tax on tobacco products payable by purchase and affixation of stamps so long as this act is operative in such county."
Nothing in Section 13 negates the taxable obligation imposed by § 3 of the Act on "any person who sells, stores, or delivers any cigarettes or smoking tobacco."
The legislature has enacted additional legislation applicable to tobacco taxes in Jefferson County since it enacted Act No. 414 in 1947. In 1949, the legislature enacted Act No. 431, amending § 5 of Act No. 414 to provide for refunds or credits for tobacco stamps on tobacco products later determined to be unsalable and amending § 6 to provide for seizure of unstamped tobacco products by the license inspector. In 1961, the legislature enacted Act No. 847, adding an additional tax to tobacco taxes in counties with a population between 300,000 and 500,000, the proceeds to be paid to the County Board of Education. Section 2 of Act No. 847 provides that "[t]he tax herein authorized to be levied shall be paid through the use of stamps. . . ." Act No. 42, Ala. Acts 1963, amended Act No. 847 to clarify that the added tobacco tax was intended to be a tax on the ultimate consumer with the wholesaler merely acting as the agent of the county. Act No. 42 also provided that the additional tax should be excluded from the gross sales in computing the sales tax.
In 1964, the legislature amended § 3 of Act No. 414, making it illegal to sell or barter "sample packs" of cigarettes and imposing a license tax on small packages of smoking tobacco. Act No. 133, Ala. Acts 1964. Section 1 of Act No. 133, amending § 3 of Act No. 414, provides that "[t]he tax levied by this act shall be paid through the use of stamps as herein provided." Act No. 133 also amended § 5 of Act No. 414 to provide credits for purchased tobacco stamps that have been damaged or are unusable and amended § 6 to provide for an appeal of an order by which unstamped tobacco is seized. In 1965, the legislature enacted Act No. 524, imposing an additional tax on tobacco in counties with a population of 500,000 or more, the revenue from the additional tax to be used to finance the building of a civic center. In 1969, the legislature amended Act No. 414 to provide a method for including recently incorporated municipalities in a share of the county tobacco-tax revenue when that municipality had not yet been subject to a federal decennial census. Act No. 327, Ala. Acts 1969.

4. Application of Rules of Construction to Act No. 414

When interpreting a statute, a court must first give effect to the intent of the legislature. BP Exploration & Oil, Inc. v. Hopkins, 678 So.2d 1052 (Ala.1996).
"The fundamental rule of statutory construction is that this Court is to ascertain and effectuate the legislative intent as expressed in the statute. League of Women Voters v. Renfro, 292 Ala. 128, 290 So.2d 167 (1974). In this ascertainment, we must look to the entire Act instead of isolated phrases or clauses; Opinion of the Justices, 264 Ala. 176, 85 So.2d 391 (1956)."
Darks Dairy, Inc. v. Alabama Dairy Comm'n, 367 So.2d 1378, 1380 (Ala.1979) (emphasis added). To discern the legislative intent, the Court must first look to the language of the statute. If, giving the statutory language its plain and ordinary meaning, we conclude that the language is unambiguous, there is no room for judicial construction. Ex parte Waddail, 827 *1075 So.2d 789, 794 (Ala.2001). If a literal construction would produce an absurd and unjust result that is clearly inconsistent with the purpose and policy of the statute, such a construction is to be avoided. Ex parte Meeks, 682 So.2d 423 (Ala.1996).
"There is also authority for the rule that uncertainty as to the meaning of a statute may arise from the fact that giving a literal interpretation to the words would lead to such unreasonable, unjust, impracticable, or absurd consequences as to compel a conviction that they could not have been intended by the legislature."
73 Am.Jur.2d Statutes § 114 (2001) (footnotes omitted).
Relying on language contained in the title to Act No. 414, McClain argues that the legislature intended to prohibit counties subject to the Act and municipalities within those counties from imposing any additional taxes or license fees on tobacco products. In Archer Daniels Midland Co. v. Seven Up Bottling Co. of Jasper, Inc., 746 So.2d 966, 969 (Ala.1999), this Court stated: "[W]hen circumstances surrounding the enactment of a statute cast doubt on the otherwise clear language of the statute, we must look to other factors in determining legislative intent." (Emphasis added.) The Court further stated:
"As the plaintiff correctly points out, § 6-5-60 is not, on its face, limited to transactions involving intrastate commerce. We hasten to add, however, that there is no language in § 6-5-60 that conclusively indicates Legislature's part to involving the shipment of commerce. Because the an intent on the regulate transactions goods through interstate language of § 6-5-60, standing alone, is not conclusive on the question of legislative intent, and because other factors, including the legislative history of Alabama's antitrust statutes, as well as the state of the law at the time of their enactment, cast doubt on the original intent of the Legislature, we find it necessary to look beyond the language of the statute."
746 So.2d at 973. The foregoing rationale applies to our determination of legislative intent with respect to Act No. 414. The Bessemer Division Cities point out that § 13, on its face, does not prohibit taxing by municipalities through means other than stamps. However, there is no language in the Act, other than by negative implication, that conclusively indicates an intent to permit such taxation. Because the Act, standing alone, is not conclusive on the question of legislative intent, and because other factors, including the legislative history of Alabama's embrace of stamps as a means of taxing tobacco, as well as the accepted means of such taxation at the time of the enactment of the Act, cast doubt on the original intent of the legislature, we "find it necessary to look beyond the language of the statute." 746 So.2d at 973.
Under Archer Daniels Midland Co., we can look to the circumstances as they existed at the time of enactment. We can also look at the title or preamble of the act. Ball v. Jones, 272 Ala. 305, 132 So.2d 120 (1961), holds that in case of doubt or inconsistency between language in an enacting part of a statute and language in its title or preamble, the title or preamble controls. But see 2A Norman J. Singer, Statutes and Statutory Construction § 47:04 at 221-22 (6th ed. 2000) ("[T]he settled principle of law is that the preamble cannot control the enacting part of the statute in cases where the enacting part is expressed in clear, unambiguous terms.").
"While the title of an act cannot contradict the plain and unambiguous terms in the enacting clause, the recitals of the title are available aids to the *1076 removal of ambiguity or uncertainty in the enacting clause. In cases of doubt in respect to an ambiguous legislative context, the preamble of an act must be resorted to ascertain the intent and resolve the doubt. To arrive at the intent of the law, the whole acttitle and enacting clausesmust be read."
Hamrick v. Thompson, 276 Ala. 605, 609, 165 So.2d 386, 390 (1964) (emphasis added).
While these cases may conflict, this Court's most recent pronouncement in Archer Daniels Midland Co. authorizes resort to the title or preamble in our pursuit of legislative intent. We can ignore the title or preamble of Act No. 414 only if we are prepared to overrule not only Ball, but also Archer Daniels Midland Co., and we have been asked to overrule neither.[8]
When we look beyond the language of the statute, it is abundantly clear that the legislature intended to displace municipalities from the collection of tobacco taxes. Taxation of tobacco by stamps was the accepted means of collecting tobacco taxes in 1947 when the Act was passed. The title to Act No. 414 indicates a broad prohibition of future license or excise taxes by municipalities. While the absurd-results doctrine should be used sparingly, a technical construction of the phrase "payable by purchase and affixation of stamps" in § 13 of the Act without considering the Act as a whole must yield to the intent of the legislature. The method used to denote payment of the tax (stamps as set out in Act No. 414 or direct payment as in the municipal ordinances) is immaterial; it is the taxation by individual municipalities already sharing in the tax collected by the County pursuant to Act No. 414 that the legislature sought to prohibit.
The absurdity of the result sought by the Bessemer Division Cities is illustrated in the following consequence of the legislature's granting to the Department of Revenue the authority to eliminate the requirement of affixing stamps on tobacco products subject to the tax levied pursuant to § 40-25-1 et seq., "Tobacco Tax." See § 40-25-2(g), which provides:
"The Commissioner of Revenue shall prepare and issue stamps in denominations for the amount of the tax imposed by this article provided that if the commissioner determines that it is not economical for the state to have a stamp prepared and issued for one or more particular types of packages of tobacco products, then he may by regulation prescribe the use of a stamp in a denomination other than for the amount of tax imposed with the difference between the amount of the tax actually imposed and the amount of the tax denominated by the stamp paid with the use of a monthly report; or he may require a monthly report without use of a stamp to report the amount of taxes due."
*1077 (Emphasis added.) Counties may request that the Department of Revenue collect "any county sales, use, rental, lodgings, tobacco, or other local taxes for which there is a corresponding state levy." § 11-3-11.3(a) (emphasis added). The Department is authorized to issue rules and regulations it may deem necessary for making returns and for assessing, collecting, and administering such taxes. § 11-3-11.3(f).
Regulation 810-7-1-.09, Alabama Administrative Code (Department of Revenue), "Procedure for Reporting and Payment of County Tobacco Taxes on Cigarettes," by its terms applicable to Act No. 414, provides an alternative method to the affixation of stamps as a means of payment of the tax levied. While the validity of the regulation is not before us, suffice it to say that if such a method of payment were implemented by the Department of Revenue, the tax levied by Act No. 414 would be payable by a means other than "by purchase and affixation of stamps." The construction urged by the Bessemer Division Cities would lead to the inconsistent, if not absurd, result that the municipalities could impose their taxes because payment would not be made by the use of stamps, yet the tax collections under Act No. 414 would also not be effectuated by stamps.
Consistent with Archer Daniels Midland Co., we affirm the judgment of the trial court as to the Bessemer Cities.

D. Attorney-Fee Award

Our previous disposition of the issue of venue requires reversal of the award of an attorney fee as to the cities of Homewood, Mountain Brook, Trussville, and Vestavia Hills and a remand for further proceedings in the event the trial court transfers the claims against those municipalities to the Birmingham Division. The appeal by the Bessemer Division Cities requires consideration of their argument that attorney fees under the common-benefit theory are not applicable to this proceeding. The Bessemer Division Cities contend that E.B. McClain has no standing and that AWDA should not be permitted to recover an attorney fee under the common-benefit theory. E.B. McClain is a state senator, and two of the three Bessemer Division Cities, Hueytown and Bessemer, are located in his district. AWDA is an association composed of distributors who are responsible for paying the tax collected from the consumer. Also before the trial court, by amendment to the complaint after the close of the evidence, are two distributors, a retailer, and an individual.
Regardless of the status of E.B. McClain or the additional plaintiffs added by amendment, AWDA clearly has standing. In Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc., 783 So.2d 792, 795 (Ala.2000), this Court adopted the federal test for determining whether an association has standing.
"See Warth [v. Seldin], 422 U.S. [490,] 515, 95 S.Ct. 2197 [(1975)], (holding that an association can have standing to sue on behalf of its members only when it seeks relief that `can reasonably be supposed . . . will inure to the benefit of those members of the association actually injured'). Accordingly, an association can seek relief on behalf of its members when:
"`(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'
"Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)."
*1078 The Bessemer Division Cities contend that the common-benefit theory of allowing an attorney fee carved from the fund when the attorney's efforts caused the creation of a fund does not apply to this proceeding because, they argue, this action involves "public litigation issues" and absence of proof of oppressive behavior on the part of any municipality. Our cases have not stated the rule in such restrictive terms, although oppression is a factor in some of the cases upholding an award of an attorney fee.
In Edelman & Combs v. Law, 663 So.2d 957, 958 (Ala.1995), we stated:
"However, this Court, like the federal courts, has long recognized that a lawyer who recovers an award for the benefit of a class of clients is entitled to a reasonable fee from the amount recovered. Ex parte Brown, 562 So.2d 485, 495 (Ala.1990), citing Boeing Co. v. Van Gemert, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); Reynolds v. First Alabama Bank of Montgomery, N.A., 471 So.2d 1238 (Ala.1985); Eagerton v. Williams, 433 So.2d 436 (Ala.1983)."
Likewise, in Battle v. City of Birmingham, 656 So.2d 344, 347 (Ala.1995), we stated:
"Whether to award or to deny attorney fees lies within the sound discretion of the trial court. On appeal, the trial court's ruling on that question is subject to reversal only upon a showing of abuse of discretion. Advertiser Co. v. Auburn University, 579 So.2d 645 (Ala.Civ.App. 1991).
"Alabama follows the `American rule,' whereby attorney fees may be recovered if they are provided for by statute or by contract or if they are called for by special equity, such as in proceedings where the attorney's efforts create a `common fund' out of which fees may be paid. Reynolds v. First Alabama Bank of Montgomery, N.A., 471 So.2d 1238 (Ala.1985)."
In Battle, we cited with approval Bell v. Birmingham News Co., 576 So.2d 669 (Ala.Civ.App.1991), in which the Court of Civil Appeals, recognizing a benefit to the public and rejecting a requirement of a finding of bad faith, upheld an attorney-fee award in proceedings brought by a newspaper against a city council challenging its failure to comply with the open-meetings law (§§ 13A-14-2, 11-43-45, and 11-43-49, Ala.Code 1975). In the case before us, the recovery served the interests of the plaintiffs as well as created a benefit for the general public and caused the creation of a common fund. The trial court, as a result of this proceeding, found a violation of state law in the imposition of an illegal tax on the public. The trial court's ore tenus finding that the plaintiffs' attorneys were entitled to a reasonable attorney fee does not exceed its discretion in this matter.

E. Application of the Doctrine of Cy Pres to the Fund

Our previous disposition of the issue of improper venue requires reversal of the trial court's application of the doctrine of cy pres to the fund as to the claims against Homewood, Mountain Brook, Trussville, and Vestavia Hills, and a remand for further proceedings in the event those claims are transferred to the Birmingham Division. The appeal by the Bessemer Division Cities requires consideration of their argument that the doctrine of cy pres is inapplicable because of the absence of difficulty in ascertaining a class of beneficiaries.
The consumers who paid the cigarette tax are smokers or tobacco users. Common sense suggests that the bulk of the people who paid this tax reside in Jefferson County. Because of the difficulty in ascertaining the identity of the taxpayers, the trial court awarded the fund to Cooper Green Hospital, the entity responsible for providing indigent health care in Jefferson *1079 County for tobacco-related illnesses. A representative of Cooper Green Hospital testified that in a 10-year period this charity hospital had expended $16,302,000 treating indigent victims of tobacco-related diseases. The representative stated that the Hospital would use taxes illegally collected by the municipalities to treat indigent patients with tobacco-related diseases such as emphysema, cancer, and chronic obstructive pulmonary disease, along with other diseases such as heart disease and diabetes.
In their opening brief, the Bessemer Division Cities contend that Cooper Green Hospital has no relationship with the consumers who paid the tax. For the first time in their reply brief, the Bessemer Division Cities argue that, assuming that the doctrine of cy pres is applicable, the fund should be awarded to "all the school systems located in the cities that enacted the tax to educate children against smoking." We decline to consider an argument made for the first time in a reply brief. See Byrd v. Lamar, 846 So.2d 334, 341 (Ala.2002), noting the "settled rule that this Court does not address issues raised for the first time in a reply brief." Because we conclude that a rational connection exists between consumers who paid the tax and Cooper Green Hospital, we consider only the question as to the applicability of the doctrine of cy pres.
The Bessemer Division Cities argue that the identity of the beneficiaries of the fund is not difficult in that the distributors who have paid the funds to the State are the only entities entitled to recover monetary damages. Under the peculiar circumstances of this case, the distributors are obligated to pay the tax, yet the added cost is passed on to the retailer and ultimately to the consumer. By participating in proceedings leading to an award of the funds to Cooper Green Hospital and by urging the affirmance of that award on appeal, AWDA, acting on behalf of the distributors, has waived any interest in the funds. Consequently, the funds are essentially unclaimed, and we must therefore consider other options for the disbursement of the funds.
The Bessemer Division Cities remind us that our caselaw dealing with the doctrine of cy pres is limited to instances where a trust cannot be administered in accordance with the terms of the trust instruments and a court is called upon to "vary such details of administration to secure the object for which the trust was created." Tumlin v. Troy Bank & Trust Co., 258 Ala. 238, 242, 61 So.2d 817, 820 (1952). Whether the doctrine of cy pres should be applied to the facts here presented is a question of first impression under Alabama law. Federal courts have recognized the utility of cy pres in the distribution of the funds collected on behalf of a class under circumstances where identifying the beneficiaries is difficult. See Powell v. Georgia-Pacific Corp., 119 F.3d 703, 706 (8th Cir.1997) ("Because neither party has a legal right to the unclaimed funds, the court correctly turned to traditional principles of equity to resolve the case. There are four ways in which courts have distributed unclaimed funds of this sort: Pro rata distribution to the class members, reversion to the defendant, escheat to the government, and cy pres distribution. See generally 2 Newberg and Conte, Newberg on Class Actions § 10.15 at 10-38, 10-39."). See also In re Airline Ticket Comm'n Antitrust Litigation, 268 F.3d 619, 625 (8th Cir.2001):
"`The term "cy pres" is derived from the Norman French expression cy pres comme possible, which means "as near as possible."' Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n, 84 F.3d 451, 455 n. 1 (D.C.Cir. 1996). The cy pres doctrine originated as a rule of construction to save a testamentary *1080 charitable gift that would otherwise fail, allowing `the next best use of the funds to satisfy the testator's intent as near as possible.' Id. (internal quotation omitted). Courts have also utilized cy pres distributions where class members `are difficult to identify or where they change constantly,' or where there are unclaimed funds. Powell [v. Georgia-Pac. Corp.], 119 F.3d [703] at 706 [(8th Cir.1997)]. `In [703] these cases, the court, guided by the parties' original purpose, directs that the unclaimed funds be distributed "for the indirect prospective benefit of the class."' Id. (quoting 2 Newberg and A. Conte, Newberg on Class Actions, § 10.17 at 10-41 (3d ed.1992)); see also Democratic Cent. Comm., 84 F.3d at 455 (cy pres distributions to `the next best class')."
The Court in Airline Ticket Comm'n Antitrust Litigation noted that cy pres distributions of unclaimed funds have been controversial in various cases. Nevertheless, precedent for the applicability of the cy pres doctrine under circumstances similar to those here presented is firmly established in federal courts. While the instant case is not a class action, the policies underlying the applicability of cy pres are equally applicable. We affirm the trial court's application of the doctrine of cy pres.

III. Conclusion

We affirm the judgment as to Bessemer, Hoover and Hueytown. We vacate the judgment as to Homewood, Mountain Brook, Trussville, and Vestavia Hills based on improper venue in the Bessemer Division, and we remand the case to the trial court with directions to dismiss the claims asserted against Homewood, Mountain Brook, Trussville, and Vestavia Hills, or to transfer the claims against those municipalities to the Birmingham Division, with disposition of the funds from the taxes collected in those municipalities in the escrow account held by the clerk of the Jefferson Circuit Court as provided in this opinion.
APPLICATION GRANTED; OPINION OF JANUARY 13, 2006, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; JUDGMENT VACATED IN PART; AND REMANDED WITH DIRECTIONS.
WOODALL, SMITH, and BOLIN, JJ., concur.
LYONS, J., and BRYAN, Special Justice,[*] concur specially.
NABERS, C.J., and SEE, HARWOOD, and STUART, JJ., concur in part and dissent in part.
PARKER, J., recuses himself (statement of recusal issued February 7, 2006, attached).
LYONS, Justice (concurring specially).
"Be not the first by whom the new are tried, Nor yet the last to lay the old aside." Alexander Pope, An Essay on Criticism (1711). I have perhaps already run afoul of the second half of Pope's admonition by clinging to my dissatisfaction with this Court's treatment of venue in the Bessemer Division of the Jefferson Circuit Court. See Ex parte Walter Indus., Inc., 879 So.2d 547, 555 (Ala.2003) (Lyons, J., dissenting). Although I do not agree with Ex parte Walter Industries, Inc., the time has come for me to acknowledge that it is the law of this State. I therefore concur in all aspects of the main opinion, albeit grudgingly with respect to the disposition of the venue issue.
*1081 BRYAN, Special Justice (concurring specially).
Justice Parker's recusal from consideration of this case on application for rehearing[9] deprived the main opinion released on January 13, 2006, of its majority and resulted in a 4-4 division of the Supreme Court. Accordingly, Chief Justice Nabers appointed me to sit as a Special Justice in place of Justice Parker on application for rehearing and to vote in the case as though I were participating in the case on original submission. Consequently, I have considered the record and all of the arguments presented by the parties on original submission, and I concur in the substituted main opinion.
HARWOOD, Justice (concurring in part and dissenting in part).
As to the venue issue, I concur in the main opinion. As to the discussion of Act No. 414, Ala. Acts 1947, I respectfully dissent.
"In John Deere Co. v. Gamble, 523 So.2d 95, 99-100 (Ala.1988), this Court, quoting Clark v. Houston County Comm'n, 507 So.2d 902, 903-04 (Ala.1987), set out the following general rule of statutory construction . . . :
"`"The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute. Advertiser Co. v. Hobbie, 474 So.2d 93 (Ala. 1985); League of Women Voters v. Renfro, 292 Ala. 128, 290 So.2d 167 (1974). If possible, the intent of the legislature should be gathered from the language of the statute itself. Advertiser Co. v. Hobbie, supra; Morgan County Board of Education v. Alabama Public School & College Authority, 362 So.2d 850 (Ala.1978)."'
"In Ex parte Pfizer, Inc., 746 So.2d 960, 964 (Ala.1999), this Court stated:
"`"When the language of a statute is plain and unambiguous, . . . courts must enforce the statute as written by giving the words of the statute their ordinary plain meaningthey must interpret that language to mean exactly what it says and thus give effect to the apparent intent of the Legislature." Ex parte T.B., 698 So.2d 127, 130 (Ala.1997). Justice Houston wrote the following for this Court in DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270 (Ala. 1998):
"`"In determining the meaning of a statute, this Court looks to the plain meaning of the words as written by the legislature. As we have said:
"`"`"Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect."'"'"
Ex parte Lamar Adver. Co., 849 So.2d 928, 930 (Ala.2002).
Most recently, we explained:
"[W]e give the words of the applicable statute their plain, ordinary, and commonly understood meaning, and we interpret the language to mean what it says. See Ex parte Gadsden Reg'l Med. Ctr., 904 So.2d 234, 236 (Ala.2004) *1082 (`"[W]e must give the words in a statute their plain, ordinary, and commonly understood meaning, and where plain language is used we must interpret it to mean exactly what it says."' (quoting Bean Dredging, L.L.C. v. Alabama Dep't of Revenue, 855 So.2d 513, 517 (Ala.2003)))."
Gray v. Gray, 947 So.2d 1045, 1048 (Ala. 2006).
Further, as we declared in Siegelman v. Chase Manhattan Bank (USA), Nat'l Ass'n, 575 So.2d 1041, 1051 (Ala.1991): "This Court's role is not to displace the legislature by amending statutes to make them express what we think the legislature should have done. Nor is it this Court's role to assume the legislative prerogative to correct defective legislation or amend statutes."
This deference to the ordinary and plain meaning of the language of a statute is not merely a matter of an accommodating judicial philosophy; it is a response to the constitutional mandate of the doctrine of the separation of powers set out in Art. III, § 43, Alabama Constitution of 1901:
"In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."
Section 13, Act No. 414, Ala. Acts 1947, states the prohibition against certain municipal taxation that is at issue in this case:
"Upon this act becoming effective or operative in any county, every then existing ordinance of every municipality within such county which levies or imposes a license tax on tobacco products payable by purchase and affixation of stamps shall be, ipso facto, repealed to the extent that it levies or imposes a license tax on tobacco products payable by purchase and affixation of stamps, and no municipality within such county shall have power or authority to re-enact or pass any ordinance which levies or imposes [a] license tax on tobacco products payable by purchase and affixation of stamps so long as this act is operative in such county."
(Emphasis added.)
Thus, in each of the three instances that a prohibition against municipal license taxes on tobacco products is stated, it is explicitly and unmistakably qualified by the limiting phrase "payable by purchase and affixation of stamps." In each instance it is not just any municipal tobacco license tax that is prohibited, only one that is so payable.
The main opinion, essentially deeming this unambiguous language to represent bad policy and to occasion unfair results, reforms it under the guise of judicial construction, so that, judicially edited, § 13 is to be understood to read:
"Upon this act becoming effective or operative in any county, every then existing ordinance of every municipality within such county which levies or imposes a license tax on tobacco products shall be, ipso facto, repealed to the extent that it levies or imposes a license tax on tobacco products, and no municipality within such county shall have power or authority to re-enact or pass any ordinance which levies or imposes [a] license tax on tobacco products so long as this act is operative in such county."
The main opinion attempts to justify this judicial rewrite by several rationales. For one thing, it states that "[a]lthough stamps were the usual method of collecting license *1083 taxes when Act No. 414 was enacted [in 1947], technology has advanced to a degree that taxes on tobacco products can be effectively collected without the use of stamps." 957 So.2d at 1073. Just what those technological advances are is not explained, but the Alabama Legislature is apparently not overly impressed by them. In 2004, the legislature undertook various revisions to § 40-25-2, which establishes a license or privilege tax, payable to the State of Alabama, on the sale or storage or receipt for the purpose of distribution, of various tobacco products, including cigarettes, smoking tobacco, chewing tobacco, and snuff. Among the resulting amendments to the Code section, was the addition of subsection (I), which provides:
"Local taxes and/or license fees, county or municipal, imposed on the sale or use of cigarettes shall be paid to the local government through the use of stamps affixed to the product as provided herein for the state tax. Provided, however, this requirement shall not be interpreted to require the Department of Revenue to prepare all stamps or to collect all local taxes. Local governments may contract with another entity to collect their local cigarette tax but all local taxes must be collected as provided herein."
As the main opinion recognizes in note 7, tobacco stamps were, and still effectively can be, "used to deter black-market tobacco and to police interstate traffic of tobacco products." 957 So.2d at 1073. The fact that the seven Jefferson County municipalities involved in this case had elected to eschew the extra level of protection and security afforded by the presence of tobacco stamps on all tobacco products sold within their respective jurisdictions is not determinative. Whether they chose to forgo the use of tobacco stamps to avoid the effect of certain impending legislation, as the plaintiffs contend (see note 3 of the main opinion), or to avoid the added expense of purchasing and distributing stamps is of no consequence, if their decision in that regard was otherwise legal and does not violate public policy.
The main opinion states that "[n]othing in Section 13 [of Act No. 414] negates the taxable obligation imposed by § 3 of the Act on `any person who sells, stores, or delivers any cigarettes or smoking tobacco.'" 957 So.2d at 1074. Act No. 414 involves a county license tax and requires wholesalers to affix stamps to the tobacco products in order to comply with the county tax imposed by the Act. The city ordinances at issue here, however, enacted under the authority accorded municipalities by § 11-51-90, Ala.Code 1975, involve a separate and additional license tax, payable to the municipalities in question.
The main opinion acknowledges that if the language of a statute is unambiguous, giving the language used its plain and ordinary meaning, "there is no room for judicial construction." 957 So.2d at 1074. The main opinion then "trumps" that basic rule of statutory construction by resort to a new rule: if the unambiguous plain and ordinary meaning of the statutory language "would produce an absurd and unjust result that is clearly inconsistent with the purpose and policy of the statute," 957 So.2d at 1075, that unambiguous language may be altered by judicial construction. Thus freed from the constraint of the plain and ordinary meaning of the unambiguous language, the main opinion resorts to consideration of the title to Act No. 414 to supersede the plain language of the text of the Act. I believe the rule of statutory construction in that regard is, and should be, as the main opinion alludes to in its "but see" citation to "2A Norman J. Singer, Statutes and Statutory Construction § 47:04 at 221-22 (6th ed. 2000) (`[T]he settled principle of law is that the preamble cannot control the enacting part of the *1084 statute in cases where the enacting part is expressed in clear, unambiguous terms.')." 957 So.2d at 1075. Ball v. Jones, 272 Ala. 305, 132 So.2d 120 (1961), on which the main opinion relies for the idea that "in case of doubt or inconsistency between language in an enacting part of a statute and language in its title or preamble, the title or preamble controls," 957 So.2d at 1075, stands for an incorrect proposition of law, as explained on original deliverance in this case, and is due to be overruled in that regard. As we explained on original deliverance:
"The title or preamble may be used to remove ambiguity or uncertainty in a statute; it cannot, however, be used to contradict the plain, unambiguous terms of the statute itself. See Newton v. City of Tuscaloosa, 251 Ala. 209, 218, 36 So.2d 487, 494 (1948) (`both the preamble and the title of an act may be looked to in order to remove ambiguities and uncertainty in the enacting clause'); United States v. McCrory, 119 F. 861 (5th Cir.1903) (if the act is free from doubt or ambiguity, the title of an act may not be resorted to in construing the act); and Bartlett v. Morris, 9 Port. 266 (Ala.1839) (the title of an act may explain what is doubtful, but it cannot control what is contained in the body of the act)."
Archer Daniels Midland Co. v. Seven Up Bottling Co. of Jasper, Inc., 746 So.2d 966, 969 (Ala.1999), which the main opinion cites, has nothing to say about the interaction between the title or preamble of an act, on the one hand, and its unambiguous text, on the other; I therefore disagree with the conclusion of the main opinion that "[w]e can ignore the title or preamble of Act No. 414 only if we are prepared to overrule not only Ball, but also Archer Daniels Midland Co., and we have been asked to overrule neither." 957 So.2d at 1076 (footnote omitted).
Even if it were appropriate to resort to the title of Act No. 414 to consider whether to alter and override the unambiguous language of the text to the statute, I would not place the importance the main opinion does on the language in the title stating that the act was intended "to prohibit future license or excise taxes by municipalities." If one relies on that statement one has to assume the act proposes to prohibit all future municipal license excise taxes, not just those relating to tobacco products. Further indicative of the fallacy of allowing language in the title to alter unambiguous language in the text of a statute is the fact that in the title to Act No. 414, the statement immediately preceding the statement prohibiting "future license or excise taxes by municipalities" declares that one purpose of Act No. 414 is "to repeal any existing ordinances or statutes in conflict with the provisions of this act." (Emphasis supplied.) The second clause of § 1 of the body of the act states unequivocally, however, "this act shall not have the effect of altering or repealing in any wise any statute now in effect, but shall be in addition to and cumulative of all laws now in effect." The proper rule of construction in this regard, whereby the title to an act has no legislative authority except in the event the express language in the body of the act is found to be ambiguous, avoids any problem in deciding between those two clashing declarations. Because the language of § 13 of Act No. 414 is plain and unambiguous, employing words readily understandable when given their ordinary plain meaning, there is no need to resort to the general language of the title as an "aid" to construing the Act.
The August United States Supreme Court Justice Oliver Wendell Holmes, Jr., once explained in a letter:
"`Only a day or two agowhen counsel talked of the intention of a legislature, I was indiscreet enough to say I *1085 don't care what their intention was. I only want to know what the words mean.'"
Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L.Rev. 527, 538 (1947). The meaning of the words the legislature used in § 13 is clear, plain, and unambiguous; I do not feel the need to cast about for a different meaning.
NABERS, C.J., and SEE and STUART, JJ., concur.
PARKER, Justice (statement of recusal).

I. The context of this statement.

On January 13, 2006, the Alabama Supreme Court released its opinion in the case of City of Bessemer v. McClain (case no. 1031917). In that decision, the Court upheld the right of the cities of Bessemer, Homewood, Hoover, Hueytown, Mountain Brook, Trussville, and Vestavia Hills ("the Cities") to levy certain taxes on tobacco products, including cigarettes, cigars, smoking tobacco, chewing tobacco, and snuff products.
Disappointed in the outcome of the case, the losing parties ("the tobacco wholesalers") filed an application for rehearing. They also filed a motion for my recusal. The tobacco wholesalers apparently have counted votes in the original decision and surmised that if I did not participate in the consideration of the application for rehearing, the original decision might be overturned and they would win.
The desire of the tobacco wholesalers to find some way to change the outcome of their case is understandable. But I believe that in their zeal to find a way to overturn the Court's original decision, the tobacco wholesalers have gone too far. Not only have they offered improper grounds for my recusal, but they have also gone out of their way to solicit media coverage of their motion for my recusal and their application for rehearingas I discovered when a journalist contacted my office for a comment on the motion.
Given the timing of the media effort (while I was considering the motion for recusal and while the Court is considering the application for rehearing) and under the circumstances (my recusal might result in a different outcome, one favorable to the tobacco wholesalers), I am troubled by the actions of the tobacco wholesalers. So far, the only explanation I can imagine for the media effort is that the tobacco wholesalers hope that press coverage will pressure the Court while it is in the midst of deliberations on the application for rehearing.
I believe such an effort to influence the deliberations of this Court is inappropriate and inexcusable; therefore, I am issuing this statement in response to the tobacco wholesalers' motion for my recusal.

II. Alabama law does not require my recusal.

A careful reading of the tobacco wholesalers' motion for my recusal reveals a number of telling points. First, they do not allege that I was, or am, biased against them. Second, and similarly, the tobacco wholesalers do not allege that they have been prejudiced by my participation in the original decision in this case. Third, they do not allege that I, or any member of my family, has an interest in the outcome of this case. Thus, by alleging no bias, no prejudice, and no interest in the outcome of the case, the tobacco wholesalers have not shown that my participation resulted in a failure of justice in this Court's deliberations on, and its decision in, their case.
In fact, because the tobacco wholesalers have alleged no bias, prejudice, or interest on my part, they have been forced to resort to the mere assertion that ethical standards have been infringed by a family relationship. Specifically, the tobacco wholesalers' sole ground for requesting my recusal in the Court's consideration of the *1086 application for rehearing is that an attorney representing one of the Cities, Jon B. Terry, is a first cousin on my mother's side of the family. Yet even thisthe best effort of the tobacco wholesalers to find some perceived reason for my recusal fails, for Alabama law does not require a judge to recuse himself from a case in which an attorney for one of the parties is the judge's cousin, so long as the attorney has no personal or financial interest in the outcome of the case.
The statutory requirements for judicial recusal are straightforward. They state that recusal on the basis of family connection applies to the parties in a case, not to the attorneys representing the parties:
"No judge of any court shall sit in any case or proceeding in which he is interested or related to any party within the fourth degree of consanguinity or affinity. . . . "
Ala.Code 1975, § 12-1-12 (emphasis supplied). Because Terry is not a party to this case, § 12-1-12 does not apply.
The tobacco wholesalers claim that Canon 3.C. of the Alabama Canons of Judicial Ethics requires my recusal from this case. They are, however, wrong. Canon 3.C. provides:
"(1) A judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned, including but not limited to instances where:

". . . .
"(d) He or his spouse, or a person within the fourth degree of relationship to either of them, or the spouse of such a person:
"(i) Is named a party to the proceeding, or an officer, director, or trustee of a party;
"(ii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;
"(iii) Is to the judge's knowledge likely to be a material witness in the proceeding."
(Emphasis supplied.) Mr. Terry is not a party to this case. Moreover, because he is an attorney representing the City of Hueytown, rather than, e.g., an attorney paid on a contingency basis from a sought monetary judgment, he also does not have a financial interest in this case. Thus, the plain reading of the applicable statute and judicial canon show no requirement that I recuse myself in this case.
Prior decisions of the Alabama Supreme Court support this interpretation of the applicable statutes and canons. For example, in Gulf States Steel Co. v. Christison, 228 Ala. 622, 154 So. 565 (1934), this Court affirmed a judgment in a case in which the judge's son was the attorney for one of the parties. In addressing what today is codified as § 12-1-12, quoted above, the Court stated that an attorney who is not a party to a case could nonetheless be an "interested party" under certain pay arrangements:
"The basis of the disqualification of the judge is not that the related attorney is employed on a contingent fee, but because such fee is payable out of the judgment recovered or is a lien on it, and that its amount is also affected by the amount of the recovery. Under such circumstances the attorney is directly interested in the subject-matter of the suit and its result. He is then a `party' within section 8570, Code [the predecessor statute to § 12-1-12]."
228 Ala. at 626, 154 So. at 567.
In Ex parte Clanahan, 261 Ala. 87, 72 So.2d 833 (1954), a petition for a writ of mandamus was denied in a case in which one of the attorneys was the son-in-law of the trial court judge. This Court said: "`In the absence of a statute or constitutional *1087 provision to the contrary, the mere fact that a judge is related to one or more of the attorneys in a cause tried before him is no ground for disqualification. . . .'" 261 Ala. at 91, 72 So.2d at 836 (quoting 30 Am.Jur. § 73, at 782). The Court reviewed the applicable caselaw and summarized it as follows:
"[T]o disqualify a judge for and on account of relationship, the relationship must be within the prohibited degree, the employment must be on a contingent basis, the fee must be a lien on the judgment or decree and the amount of the fee must be affected by the amount of the recovery."
261 Ala. at 93, 72 So.2d at 838. The Court then applied the test to the trial judge's son-in-law:
"To sum up the situation, Grady Hurst, Jr. [the son-in-law] is not employed on a contingent basis, the amount of his fee is not dependent upon the result of the litigation, he does not have a lien by virtue of the statute and his relationship to Judge Pelham, therefore, does not disqualify Judge Pelham."
261 Ala. at 95, 72 So.2d at 840. See also Davis v. State, 554 So.2d 1094, 1098 (Ala. Crim.App.1986), aff'd, 554 So.2d 1111 (Ala. 1989) ("The district court judge's brother, acting in his official capacity as an assistant district attorney, did not have `an interest that could substantially be affected by the outcome of the proceedings. . . . '").
In State ex rel. Smith v. Deason, 264 Ala. 596, 88 So.2d 674 (1956), this Court affirmed a judgment in a case even though the father of the judge represented one of the parties in the proceeding:
"It is self-evident that all attorneys are `interested' in the outcome of their client's case. There is, however, a most important distinction between an `interest in the outcome of the case' and interest in the subject matter of the suit. . . . If we are to find an interest in the subject matter of the suit by Mr. Fite, Sr., it must necessarily result from his employment by the Board of Revenue; and we must further assume, and find as a fact, that the outcome of the present proceeding would have a direct bearing on his continued employment by the Board. The authorities cited by the appellant do not support the conclusion that Mr. Fite, Sr., was a `party' to the case in the present circumstances. It is our opinion that the possible effect on future employment of this attorney is too remote an interest in the outcome of the litigation to establish Mr. Fite, Sr., as a `party' within the statutory prohibition. We, therefore, conclude that the court below did not err in its ruling on appellant's motion to require the trial judge to recuse himself."
264 Ala. at 600, 88 So.2d at 677-78. The above case is directly analogous to the present case; Mr. Terry, like Mr. Fite, Sr., is an attorney representing a civil government authority and is not to be paid on the basis of a contingency fee. This case seeks declaratory relief; it does not involve a monetary judgment.
Given the facts of this case, which includes no monetary interest for Mr. Terry, I am not surprised that the tobacco wholesalers have declined to allege that he was an interested party or that he had "an interest that could be substantially affected by the outcome of the proceedings." They have also declined to allege that I had any knowledge of any such nonexistent interest. Consequently, the only appropriate legal conclusion is that "the possible effect on future employment of [Mr. Terry] is too remote an interest in the outcome of the litigation to establish [Mr. Terry] as a `party' within the statutory prohibition." 264 Ala. at 600, 88 So.2d at 678.
*1088 Given the tobacco wholesalers' failure to supply support for their position in the text of the applicable statutes and canons or the holdings of prior decisions of this Court applying those statutes and canons, I am at a loss to discover on what basis they believe my recusal is required. The only authority I can conceive of that they could argue supports their position with apparent plausibility is the Alabama Judicial Inquiry Commission ("JIC"), which in its advisory opinions has interpreted Canon 3.C. (1)(d)(i) more broadly than has this Court. The JIC advises that the sole fact that a familial relationship exists between a judge and an attorney disqualifies a judge.
Relying on the JIC as authority to mandate my recusal in this case would be erroneous for at least two reasons. First, the tobacco wholesalers would be relying on a JIC advisory opinion, not a JIC determination in a complaint. That distinction is crucial, because a JIC advisory opinion is designed for the valuable but specific purpose of providing a safe harbor for a judge inquiring about ethical considerations; it is not a conclusive statement of the law:
"The [JIC] opinions are rendered for the benefit of a judge, and are admissible on behalf of a judge should he act consistent with the opinion and then have disciplinary proceedings brought against him for that conduct."
Ex parte Balogun, 516 So.2d 606, 609 (Ala. 1987). Thus, it is proper for a judge to rely on a JIC advisory opinion to ensure that he would not be convicted in a trial pursuant to a complaint filed with the JIC based on actions taken in reliance on that opinion. It is, at the same time, also possible to comply with the ethical standards prescribed by statutes and canons without following every advisory opinion issued by the JIC. That is because a trial does not precede an advisory opinion, so the opinion cannot conclusively apply the law to the particular facts of a case. Consequently, the Alabama Supreme Court has held that JIC advisory opinions, just like this Court's own advisory opinions, are not binding:
"`Similar to an advisory opinion of this Court pursuant to § 12-2-10, Code of Alabama (1975), the [Judiciary Inquiry] Commission's advisory opinions are not binding and do not affect a party's rights or remedies. See Alabama Education Ass'n v. James, 373 So.2d 1076 (Ala.1979); Opinion of the Justices No. 269, [384 So.2d 1051 (Ala. 1980)].'"
Ex parte City of Dothan Personnel Bd., 831 So.2d 1, 6 (Ala.2002) (quoting Ex parte Balogun, 516 So.2d at 609) (emphasis supplied).
Because JIC advisory opinions are not binding authority, and because this Court has not officially adopted the view of the JIC on this matter, the plain meaning of the text of the applicable statutes and canons prevails.[10]

III. The tobacco wholesalers' request for my recusal after the decision in this case was released and their soliciting of media coverage are suspect.

Given the weight of the law and the applicable precedent against the tobacco wholesalers' position, I am particularly troubled by the timing of their motion to recuse, combined with the concurrent solicitation of media coverage of that motion. It is particularly telling that the tobacco wholesalers waited until after they became *1089 aware that the Court did not rule in their favor and after they discovered I was part of the majority ruling against them to file the motion seeking my recusal. In Gulf States Steel Co. v. Christison, where the objection similarly was made after trial, this Court wrote:
"In Collins v. Hammock, 59 Ala. 448 [(1877)], it said that no objection to the competency of the judge was raised on the trial, but first came upon a motion to quash execution and vacate the judgment made several years after it was rendered. This was said to be a collateral attack, and that, since it was not void, the attack was ineffectual. The opinion quoted from Freeman on Judgments that, `If the facts are known to the party recusing, he is bound to make his objection before issue joined, and before the trial is commenced, otherwise he will be deemed to have waived the objections, in cases where the statute does not make the proceedings void.' Fifth Edition, § 329."
228 Ala. at 626, 154 So. at 568. Here, the tobacco wholesalers have not given any reason for their delay in filing this motion for my recusal. Thus the weight of presumption is against granting their request. Furthermore, there are strong judicial policy reasons that militate against granting a postjudgment motion to recuse:
"To permit a party to disqualify a judge after learning how the judge intended to rule on a matter would permit forum-shopping of the worst kind. It would also be inequitable, because it would afford the moving party an additional opportunity to achieve a favorable result while denying a similar opportunity to its adversary. For these reasons, it is generally agreed that a party who has a reasonable basis for moving to disqualify a judge should not be permitted to delay filing a disqualification motion in the hope of first obtaining a favorable ruling, and then complain only if the result is unfavorable to his cause."
Richard E. Flamm, Judicial Disqualification § 18.2.2 at 532-33 (1996).
Further militating against granting the tobacco wholesalers' motion for my recusal in this case is their apparent lobbying effort through the media in support of their request. This kind of public relations effort a direct attack on a sitting Justice while a case is pending on rehearing because of his vote in the original decision is unprecedented. It should not be rewarded by a positive response, lest it invite imitation.

IV. Conclusion.

Before I was contacted by the journalist inquiring about the tobacco wholesalers' motion for my recusal, my plan was to recuse myself from consideration of the application for rehearing to avoid "the appearance of evil"[11]not because I believe my decision to participate in the case was in any way suspect but because there is a real conflict between the holdings of this Court and the advisory opinions of the JIC and because I wanted to give this Court an opportunity to rule definitively on the conflict.
The inquiry from the media does not change my plan to recuse myself (to permit it to do so would be to enable improper interference with an application for rehearing before this Court), but it has resulted in my drafting this corrective explanation of the state of the law as well as my admonishing the tobacco wholesalers for their improper actions. Such impropriety should not be overlooked or allowed to continue, and I will not condone similar *1090 actions by other parties that come before this Court in the future.
Meanwhile, I recuse myself from consideration of the application for rehearing in this case.

On Second Application for Rehearing
SEE, Justice.
This application for rehearing challenges the propriety of the Chief Justice's appointment of a Special Justice following a Justice's recusal in the appeal. Because the Chief Justice appropriately exercised the powers granted to him by the Judicial Article of the Constitution of Alabama of 1901, we deny the application.

Factual and Procedural History
E.B. McClain, the Alabama Wholesale Distributors Association, W.L. Petrey Wholesale Company, City Wholesale Grocery Company, Tobacco Post LLC, and Charles Lee Rackley, Jr. (collectively "McClain"), brought the underlying action. They challenged several municipal ordinances that impose a tax on tobacco products sold within the city limits of the cities of Bessemer, Birmingham, Fairfield, Homewood, Hoover, Hueytown, Mountain Brook, Trussville, and Vestavia Hills. McClain argued that these ordinances are invalid because they tax tobacco products in violation of Act No. 414, Ala. Acts 1947.[1] The trial court found that the municipal ordinances violate Act No. 414. The cities of Bessemer, Homewood, Hoover, Hueytown, Mountain Brook, Trussville, and Vestavia Hills appealed.
In an opinion issued on January 13, 2006, this Court reversed the judgment of the trial court in a 5-4 decision, in which all sitting Justices voted. McClain applied for a rehearing and filed a motion seeking the recusal of Justice Tom Parker, one of the Justices who had concurred in the majority opinion on original submission. In response to the motion, Justice Parker recused himself from consideration of the application for a rehearing in order to avoid "the appearance of evil." City of Bessemer v. McClain, 957 So.2d 1061, 1089 (Ala.2006) (opinion issued on rehearing) (recusal statement of Parker, J.). Because Justice Parker's recusal left an evenly divided Court, Chief Justice Nabers appointed Judge Tommy Bryan of the Alabama Court of Civil Appeals as a Special Justice for deliberations on the application for a rehearing.
On rehearing, this Court on July 28, 2006, granted the application for rehearing and substituted an opinion affirming the judgment in part, vacating the judgment in part, and remanding the cause with instructions. The Court affirmed the trial court's judgment declaring invalid the ordinances adopted by the cities of Bessemer, Hoover, and Hueytown because they violate Act No. 414. Based on its conclusion that venue in the Bessemer Division was improper as to the cities of Homewood, Mountain Brook, Trussville, and Vestavia Hills, the Court vacated the trial court's judgment as to those cities and remanded the case with instructions to dismiss the claims against those cities or to transfer those claims to the Birmingham *1091 Division of the Jefferson Circuit Court. Special Justice Bryan concurred in the 5-4 opinion on rehearing, which reversed the holding of the original opinion that the ordinances did not violate Act No. 414, Ala. Acts 1947.[2]
In this second application for a rehearing, Bessemer, Hoover, and Hueytown ("the Cities") argue that the manner in which the Chief Justice appointed Special Justice Bryan violates a constitutional and statutory scheme that empowers the Governor alone to appoint a Special Justice to serve on this Court in the event of an evenly divided Court. We overrule the application.

Analysis
The Judicial Article of the Constitution of Alabama of 1901 was amended in 1973 to repeal the original Article VI and to create the Unified Judicial System of the State of Alabama. Section 149 of Article VI, Ala. Const. of 1901 (Off. Recomp.),[3] establishes the Chief Justice of the Supreme Court of Alabama as the administrative head of the State's judicial system. The Judicial Article provides that, in that capacity, the Chief Justice "may assign appellate justices and judges to any appellate court for temporary service and trial judges, supernumerary justices and judges, and retired judges and retired appellate judges for temporary service in any court."
The Cities argue, however, that this constitutional provision was not intended to upset the preexisting statutory scheme, in which the Governor has the sole authority, in cases when the Court is evenly divided because of a Justice's recusal, to appoint a Special Justice. Section 12-2-14, Ala.Code 1975, provides:
"When by reason of disqualification the number of judges competent to sit in a case is reduced to eight or to six and there is equal division among them on any question material to the determination of the case, the fact shall be certified by the Chief Justice or, when he is disqualified, by the judges sitting to the Governor, who shall thereupon appoint a member of the bar of the Supreme Court to sit as a judge of said court in the determination of said case. Similarly, when by reason of disqualification no one of the judges is competent to sit in a case or the number is reduced below six, the fact shall be certified by the Chief Justice, if he is competent to sit, or, if not, by the judge or judges sitting, or, if no one is competent, by the clerk of the court to the Governor, who shall thereupon appoint members of the bar of the Supreme Court to constitute a special court of seven members for the consideration and determination of such case."
The Cities argue that before ratification of the Judicial Article in 1973, "it was clear that Section 12-2-14 vested the Governor with the authority to appoint special justices[, and] [t]he Supreme Court has long followed this procedure where disqualification of justices required the appointment of special justices." Appellants' brief in support of application for rehearing at 3. For instance, in Johnston v. Alabama Public Service Commission, 287 Ala. 417, 422, 252 So.2d 75, 79 (1971), when a sitting Justice's recusal resulted in a 4-4 division, the Governor appointed a Special Justice to hear the case.
*1092 The people of the State of Alabama, however, ratified the new Judicial Article in 1973. The Cities recognize that, since that time, the Chief Justice has consistently used the powers granted to him by Art. VI, § 149, as the administrative head of the court system to appoint Special Justices in the event a recusal left the Court evenly divided. They also correctly point out that, "in no reported decision has the Chief Justice's authority to appoint a special justice ever been challenged or decided." Appellants' brief at 5.
The Cities argue that interpreting § 149 of the Judicial Article to allow the Chief Justice to appoint a Special Justice in the instant case "would lead to a direct conflict between the `Judicial Article of the Alabama Constitution and Section 12-2-14 of the Alabama Code.'" Appellants' brief at 8. They contend that, given the presumption of validity accorded to legislative acts, this Court should not construe § 149 as invalidating § 12-2-14, Ala.Code 1975.
It is true that, "`[i]n passing upon the constitutionality of a legislative act, [the Court] uniformly approach[es] the question with every presumption and intendment in favor of its validity, and seek[s] to sustain rather than strike down the enactment of a coordinate branch of the government.'" McInnish v. Riley, 925 So.2d 174, 178 (Ala.2005) (quoting Alabama State Fed'n of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944) (emphasis omitted)). However, "[w]hen the Constitution and a statute are in conflict, the Constitution controls. . . ." Parker v. Amerson, 519 So.2d 442, 446 (Ala.1987).
The Cities suggest that § 149 may be read in harmony with § 12-2-14 in the following manner:
"First, § 12-2-14 vests the authority to appoint special Supreme Court justices with the Governor. . . . Section 12-1-14 gives the Supreme Court the authority to appoint to temporary service special judges in the Alabama lower courts. Adopting an interpretation of Judicial Article Section 149 that allows the Chief Justice to appoint special judges and justices for all of the lower courts in Alabama, while preserving the Governor's authority to appoint special justices for the Supreme Court in cases such as the instant case, would allow Art. VI, Section 149 and Ala Code §§ 12-1-14 and 12-2-14 to coexist without conflict."
Appellants' brief at 8-9. "We must afford the Legislature the highest degree of deference, and construe its acts as constitutional if their language so permits." Monroe v. Harco, Inc., 762 So.2d 828, 831 (Ala.2000). In this case, the Cities' attempt to harmonize the Constitution with the statute is not permitted by the language of the respective text of § 149 and § 12-2-14.
The Judicial Article states that "the chief justice may assign appellate justices and judges to any appellate court. . . ." Art. VI, § 149. "`In construing a constitutional provision, the courts have no right to broaden the meaning of words used and, likewise, have no right to restrict the meaning of those words.'" This Court is "`not at liberty to disregard or restrict the plain meaning of the provisions of the Constitution.'" City of Birmingham v. City of Vestavia Hills, 654 So.2d 532, 538 (Ala.1995) (quoting McGee v. Borom, 341 So.2d 141, 143 (Ala.1976)). Thus, we cannot adopt an interpretation of § 149 of the Judicial Article that requires the Court to ignore words in the constitutional scheme. The Cities' attempt to harmonize § 149 and § 12-2-14, suggesting "an interpretation of Judicial Article Section 149 that allows the Chief Justice to appoint special judges and justices for all of the lower courts in Alabama," simply ignores the fact that the Supreme Court of *1093 Alabama is an appellate court and that it is the only court to which a "special justice" would be assigned. See Ala. Const. of 1901, Art. VI, § 140(c) (Off.Recomp.) ("The supreme court shall have such appellate jurisdiction as may be provided by law."). To the extent that § 12-2-14 would conflict with the Alabama Constitution and require the Chief Justice to step aside and to allow the Governor to appoint Special Justices, the statute does not control.
Section 149 of the Constitution is phrased in permissive terms; it thus grants the Chief Justice the power to assign Special Justices to the appellate courts, but it does not mandate that he do so. Section 12-2-14, on the other hand, is phrased in mandatory language. The statute confines the power of the Chief Justice to assign, requiring the Chief Justice to certify the fact of a divided Court to the Governor so that the Governor can make the appointment of the Special Justice. Section 12-2-14, in effect, mandates that the Chief Justice step aside and not exercise his constitutional appointment powers. It is not possible to square the grant of power from the Constitution, which, without limitation, allows the Chief Justice to appoint Special Justices to any appellate court, with an interpretation of § 12-2-14 that limits the Chief Justice's ability to exercise that power.
Furthermore, this Court has consistently used the Chief Justice's constitutional powers to assign Special Justices to temporary service on this Court. Apparently, the case of Bowling v. Pow, 293 Ala. 178, 301 So.2d 55 (1974), represents the first instance in which a Chief Justice exercised these constitutional powers. Following the recusal of three Justices, Chief Justice Heflin assigned Judge Leigh Clark, a supernumerary circuit judge, to serve temporarily as a Special Justice of the Supreme Court "under the provisions of Section 6.10 [now § 149] of the new Judicial Article." 293 Ala. at 188, 301 So.2d at 64-65. The Court, in a per curiam order following the main opinion, held that an assignment under § 6.10 of Amend. No. 328 (now § 149) "is without limitation as to duties and functions and that under such assignment a supernumerary circuit judge has the authority to vote on cases before the court." 293 Ala. at 188, 301 So.2d at 65. Five Justices of the Supreme Court concurred with this per curiam order, legitimating the separate opinion of the 4-3 majority written by Special Justice Clark. Id.
In Duncan v. Johnson, 338 So.2d 1243 (Ala.1976), the Chief Justice and all Justices of the Court recused themselves. Chief Justice Torbert, "pursuant to Section 6.10 of Constitutional Amendment 328," temporarily appointed a Special Supreme Court, headed by Supernumerary Circuit Judge Clark as Special Chief Justice, to decide the case. 338 So.2d at 1244 (reporter of decisions' note regarding recusal). A few years later, in Ex parte State of Alabama, 405 So.2d 932 (Ala. 1980), Chief Justice Torbert recused himself. However, he transferred his authority to appoint Special Justices to the senior Associate Justice of the Supreme Court pursuant to § 12-2-5, Ala.Code 1975 (authorizing the senior Associate Justice to perform the Chief Justice's duties in the event the Chief Justice is unable to perform those duties). Justice Hugh Maddox, "pursuant to the authority contained in the provisions of Section 6.10 [now § 149] of the Judicial Article . . . and § 12-2-5," assigned the Honorable Pelham J. Merrill, a retired Justice, to the Court for the case. 405 So.2d at 933 n. 1.
More recently, in Hornsby v. Sessions, 703 So.2d 932 (Ala.1997), the Chief Justice and all Associate Justices recused themselves from considering former Chief Justice Hornsby's declaratory-judgment action, *1094 in which he argued that he had held the office of Chief Justice in a de jure fashion from the end of his term until his replacement was qualified. 703 So.2d at 935 n. 2. Chief Justice Hooper and Justice Maddox, the senior Associate Justice, independently decided that they were disqualified to make an assignment of a Special Supreme Court to hear the case. Therefore,
"[t]he next senior Associate Justice, with the advice, consent, and concurrence of the other Associate Justices who (as to the matter of assigning Special Justices) were not recused or disqualified assigned a retired circuit judge to serve as a Special Chief Justice and assigned eight other retired circuit judges to serve as Special Justices. See § 6.10, Amend. No. 328, Ala. Const.1901."
703 So.2d at 935 n. 2.
These cases demonstrate this Court's practice of using the Chief Justice's constitutional powers to assign Special Justices to hear cases.[4]See also Pippin v. Brassell, 455 So.2d 816, 816 (Ala.1984) (noting the appointment of a Special Chief Justice and Special Associate Justices following the recusal of all the sitting Justices); and reporter of decisions' note regarding recusal in Parsons Steel, Inc. v. Beasley, 600 So.2d 248, 253 (Ala.1992) (stating that, upon recusal of eight Justices, "Chief Justice *1095 Hornsby, acting pursuant to § 6.10 [now § 149]," appointed a Special Chief Justice and six Special Associate Justices).[5]
We hold § 12-2-14, Ala.Code 1975, invalid to the extent that it improperly restricts the Chief Justice's constitutionally granted power to assign Special Justices to serve temporarily on this Court. Because the Chief Justice was not required to certify the fact of an evenly divided court to the Governor and to allow the Governor to make the appointment, his assignment of Special Justice Bryan was a valid exercise of the Chief Justice's constitutional powers.

Conclusion
The Chief Justice properly exercised his constitutional powers to appoint Special Justice Bryan to hear this case. Because the Cities in their application for rehearing have not raised any fact or point of law this Court overlooked or misapprehended on original submission, we overrule their application for a rehearing.
APPLICATION OVERRULED.
NABERS, C.J., and HARWOOD, WOODALL, STUART, SMITH, and BOLIN, JJ., and BRYAN, Special Justice,[*] concur.
LYONS, J., dissents.
PARKER, J., recuses himself.
LYONS, Justice (dissenting).
Because I see a separate field of operation for § 149, Ala. Const. of 1901 (Off. Recomp.), and § 12-2-14, Ala.Code 1975, I must respectfully dissent. Section 149 provides: "The chief justice may assign appellate justices and judges to any appellate court for temporary service and trial judges, supernumerary justices and judges, and retired trial judges and retired appellate judges for temporary service in any court." (Emphasis added.) The use of the permissive "may" recognizes the existence of limits on the authority of the Chief Justice in making such appointments. Had the language employed been the mandatory "shall," then § 149 would cover not only instances when an assignment is necessary for the discharge of court business, such as dealing with a backlog due to a vacancy on the Court or a Justice's temporary incapacity, but also in circumstances of deadlock or disqualification of all Justices. But mandatory language appears only in § 12-2-14, providing that in the event of disqualification producing equal division or when all are disqualified, that fact "shall" be certified to the Governor who "shall" appoint a Special Justice or Court. On this reading of the two provisions, § 12-2-14 would survive the ratification of § 149 because the constitutional provision is not inconsistent with the statute. Article VI, § 161(h), Ala. Const. of 1901 (Off. Recomp.) ("Except to the extent inconsistent with the provisions of this article, all provisions of law and rules of court in force on the effective date of this article shall continue in effect until superseded in the manner authorized by the Constitution."). To the extent precedent conflicts with this analysis, I do not consider stare decisis to have the same force when construing a constitutional provision. See Ex parte Dan Tucker Auto *1096 Sales, Inc., 718 So.2d 33, 42 n. 10 (Ala. 1998) (Lyons, J., concurring specially) (citing Gwin, White & Prince, Inc. v. Henneford, 305 U.S. 434, 454-55, 59 S.Ct. 325, 83 L.Ed. 272 (1939) (Black, J., dissenting), in which Justice Black stated: "`[T]he rule of stare decisis cannot confer powers upon the courts which the inexorable command of the Constitution says they shall not have'").
NOTES
[1] The City of Birmingham never answered the complaint. The record does not indicate that any further action was ever taken against the City of Birmingham, and the City of Birmingham is not listed as an appellant.
[2] The City of Fairfield subsequently enacted Ordinance No. 967, repealing Ordinance No. 964. The City of Fairfield also asserted that it had not collected any taxes pursuant to Ordinance No. 964 and requested that the trial court dismiss the complaint as to it. The trial court granted this motion on agreement of the parties. However, the City of Fairfield subsequently notified the trial court that it had, in fact, collected some taxes under Ordinance No. 964 but had not added those tax revenues to the city coffers. The record is not entirely clear as to how this matter was resolved by the trial court. However, the City of Fairfield is not listed as an appellant.
[3] According to McClain, the above-referenced ordinances were hastily adopted in 2003 when Governor Riley was seeking the enactment by the legislature and the approval by the public of a package of tax bills, particularly Act No. 2003-109, Ala. Acts 2003, a part of Governor Riley's tax-and-accountability package. Act No. 2003-109 contained a provision that would freeze taxes a municipality would impose on tobacco at the rate then in place if voters approved the package. McClain asserted that the municipalities within Jefferson County enacted additional tobacco taxes in an attempt to "beat" the enactment of Governor Riley's tax package and the caps it would place on municipal tobacco taxes.
[4] The legislature subsequently amended § 40-25-2, Ala.Code 1975, to prohibit the imposition of local taxes and/or license fees on tobacco products by a county or municipal government except through the use of stamps affixed to the tobacco product. See Act No. 2004-545, Ala. Acts 2004, § 1, amending § 40-25-2(I), Ala.Code 1975.
[5] The trial court ordered the Cities to remit all of the funds collected under the taxing ordinances to the clerk of the Jefferson Circuit Court and that those funds be held by the clerk until the case was resolved on appeal or until the time for appeal had expired.
[6] Jefferson County constitutes the Tenth Judicial Circuit; that circuit is divided into two divisionsthe Birmingham Division and the Bessemer Division.
[7] Tobacco taxes existed before the American Revolution. In 1794, Congress passed its first tobacco tax. Stamps were affixed to tobacco products to prevent fraud. See Pace v. Burgess, 92 U.S. (2 Otto) 372, 375, 23 L.Ed. 657 (1875) ("[The stamp] was a means devised to prevent fraud, and secure the faithful carrying out of the declared intent with regard to the tobacco so marked."). Tobacco stamps were used to deter black-market tobacco and to police interstate traffic of tobacco products.
[8] Justice Harwood's dissenting opinion acknowledges the necessity of sua sponte overruling Ball in order to reverse the judgment of the trial court. Justice Harwood argues that we need not overrule Archer Daniels Midland Co.; we can simply ignore it on the ground that it "has nothing to say about the interaction between the title or preamble of an act, on the one hand, and its unambiguous text, on the other," 957 So.2d at 1084. Of course, Archer Daniels Midland Co. is cited for its highly relevant discussion of the propriety of looking to other factors in determining legislative intent when circumstances surrounding the enactment of a statute cast doubt on the otherwise clear language of a statute. Justice Harwood's dissenting opinion also criticizes the main opinion for rejecting an absurd result, yet reaches its own absurd result in suggesting that the language in the title, "to prohibit future license or excise taxes by municipalities," should be read as applying beyond the context of the single paragraph in which it appears dealing solely with taxation of cigarettes or smoking tobacco.
[*] Judge Tommy Bryan of the Alabama Court of Civil Appeals was appointed on June 21, 2006, to be a Special Justice in regard to this appeal.
[9] See Justice Parker's statement of recusal issued on February 7, 2006, and attached to the substituted opinion released today.
[10] In fact, the only reference I have found that this Court has made to these JIC advisory opinions was in passing as dicta in a footnote to a statement of nonrecusal by Justice See, in Archer Daniels Midland Co. v. Seven Up Bottling Co. of Jasper, Inc., 746 So.2d 966, 990-97 (Ala.1999).
[11] I Thessalonians 5:22, which the Commentary to Canon 2, Alabama Canons of Judicial Ethics, restyles as to avoid the "appearance of impropriety."
[1] The Act provides, in pertinent part:

"SECTION 13. Upon this act becoming effective or operative in any county, every then existing ordinance of every municipality within such county which levies or imposes a license tax on tobacco products payable by purchase and affixation of stamps shall be, ipso facto, repealed to the extent that it levies or imposes a license tax on tobacco products payable by purchase and affixation of stamps, and no municipality within such county shall have power or authority to re-enact or pass any ordinance which levies or imposes [a] license tax on tobacco products payable by purchase and affixation of stamps so long as this act is operative in such county."
[2] Even without Special Justice Bryan's vote, the Court had a majority on the issue of venue and on the holding that the Alabama Taxpayer Bill of Rights provided no administrative remedies the plaintiffs had to exhaust before they could bring an action in court challenging the ordinances. 957 So.2d at 1069.
[3] Section 149 of Article VI is often referred to in cases as § 6.10, Amend. No. 328, Ala. Const.1901, and as Amendment No. 328.
[4] The Cities argue that, in Moore v. Judicial Inquiry Commission, 891 So.2d 848 (Ala. 2004), this Court changed its practice. They argue that we should follow the practice used in Moore, which would require the Chief Justice to certify the case to the Governor for the Governor to appoint the Special Justice pursuant to § 12-2-14.

Moore involved Chief Justice Roy Moore's challenge to his removal from office by the Court of the Judiciary following his refusal to comply with a federal court order. The Court "authorized the acting Chief Justice to `participate with the Governor in a random drawing' of 20 names from a pool of retired justices and judges" qualified to serve. 891 So.2d at 850 n. 1. The remaining eight Justices, "having provided a mechanism affording Roy S. Moore a right to be heard, . . . recuse[d themselves]." Id. The clerk of the Supreme Court then chose seven names at random, and the acting Chief Justice and the Governor both appointed them to serve as a Special Supreme Court. In using this mechanism to appoint a Special Supreme Court, the Court cited both § 6.10 of Amend. No. 328 (now § 149) and § 12-2-14.
In Moore, this Court did not hold, as the Cities recognize, that appointments of Special Justices must be made by the Governor pursuant to § 12-2-14. The Cities simply point out that Moore represents a break in the Court's practice of assigning Special Justices through the Chief Justice's constitutional powers and demonstrates this Court's acceptance of the Governor's statutory appointment power. Moore, however, demonstrates that the Governor does not have the sole power of appointment in the circumstances presented by the case at bar.
If this Court had decided that § 12-2-14 governs in a situation where all the judges are required to recuse, this Court would have followed the procedures that the statute specifies, namely:
"When by reason of disqualification no one of the judges is competent to sit in a case . . . the fact shall be certified by the Chief Justice, if he is competent to sit, or, if not, by the judge or judges sitting, or, if no one is competent, by the clerk of the court to the Governor, who shall thereupon appoint members of the bar of the Supreme Court to constitute a special court of seven members for the consideration and determination of such case."
§ 12-2-14, Ala.Code 1975. In Moore, however, the Court "authorized" the acting Chief Justice to "participate with" the Governor to create a pool of 20 retired Justices and Judges from which 7 names would be drawn at random. A plain reading of the statute, on the other hand, indicates that the Governor alone and in his sole discretion has the power to appoint. Thus, this Court did not in Moore abandon the constitutional powers granted to the Chief Justice. Instead, the mechanism the Court chose to use in Moore constrained the Governor's discretion in the appointment process, something the Court could not have done if § 12-2-14 governed.
[5] Another case cited by the Cities is Taylor v. Liberty National Life Insurance Co., 462 So.2d 907 (Ala.1985). The Court cited § 12-2-14, Ala.Code 1975, to justify its decision by a majority of four. However, that case involved neither an evenly divided court nor the appointment of a Special Justice.
[*] Judge Tommy Bryan of the Alabama Court of Civil Appeals was appointed on June 21, 2006, to be a Special Justice in regard to this appeal.